IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

Plaintiff,

v.

VASILIKI PAPPAS, and

MARIA PAPPAS,

Defendants.

Civil Action No. 22-12042

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, and acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

## NATURE OF ACTION AND OVERVIEW

1.     This is a civil action brought by the United States against Defendants Vasiliki Pappas and Maria Pappas under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675. More specifically, the United States brings this action under CERCLA Section 104(e), 42 U.S.C. § 9604(e), seeking: (i) a court order

1

granting EPA access to certain real property parcels owned by the Defendants for the purposes of determining the need for CERCLA response actions, or choosing or taking CERCLA response actions, at those properties; and (ii) the court's assessment of civil penalties against the Defendants for their refusal to afford EPA access for the purpose of taking certain CERCLA response actions at their property.

2. Defendants own several property parcels at the Jackson Cleaners Site (the "Site"), an area of Ypsilanti, Michigan contaminated by tetrachlorethylene (also known as perchloroethylene or "PCE") and other hazardous substances. The Site includes a set of historic, two-story, mixed-use row buildings along North Huron Street in Ypsilanti, with occupied and vacant retail space on the ground level and occupied and vacant residential living spaces on the upper level, as shown in this March 2020 photo:



3.     In one of these buildings, the Defendants owned and operated Jackson Cleaners, a dry-cleaning business shown in the photo above that utilized PCE.

4.     Since 2019, the Michigan Department of the Environment, Great Lakes, and Energy ("EGLE") and EPA have performed environmental investigations at the Site showing that Jackson Cleaners' use of PCE has resulted in releases of PCE to soils, groundwater, and the ambient air at the Site, as well as the emission and intrusion of PCE vapor into the row buildings at the Site.

5.     Throughout late 2020 and early 2021, EPA unsuccessfully sought access to Defendants' properties at the Site (the "Property") through various means, including by making repeated requests for access by consent.

6.     In July 2021, the Defendants finally executed a written "Consent for Access to Property," granting EPA a right to access their Property for various purposes through July 1, 2023.

7.     In April 2022, EPA issued the Defendants a Unilateral Administrative Order (the "2022 EPA Order") requiring the Defendants to: (i) perform particular CERCLA response activities on their Property, including removing a decommissioned dry cleaning machine that had been identified as a major source of airborne PCE emissions (the "Dry Cleaning Machine"); and (ii) allow EPA access to oversee that response work by the Defendants or allow EPA access to perform that response work if the Defendants failed to complete it.

8.     In June 2022, EPA notified the Defendants that EPA was taking over responsibility for performance of the response work required by the 2022 EPA Order – including removal of the Dry Cleaning Machine – due to Defendants' failure to comply with requirements of the 2022 EPA Order.

9.     Consistent with the Defendants' Consent for Access to Property and the access provisions of the 2022 EPA Order, EPA gave the Defendants advance notice of its plan to remove the Dry Cleaning Machine on July 28, 2022. However, on July 27, 2022 – the day before that work was scheduled to occur – the Defendants denied EPA unconditional access to their Property for the purpose of removing the Dry Cleaning Machine.

10.    In light of the circumstances summarized here (and outlined in greater detail below), the United States seeks an order in aid of access to Defendants' Property under CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), for the purpose of removing the Dry Cleaning Machine and carrying out other necessary CERCLA response activities at their Property. The United States also seeks civil penalties under CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), for Defendants' refusal to afford EPA access to their Property for the purpose of removing the Dry Cleaning Machine since July 27, 2022.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over the subject matter of this action and personal jurisdiction over the Defendants under CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1331 and 1345.

12.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the release or threatened release of a hazardous substance or substances that gives rise to this claim occurred and is occurring in this district and because Defendants' Property is located within this district.

## THE DEFENDANTS AND THEIR PROPERTIES

13.     Defendants Vasiliki Pappas and Maria Pappas are the owners of, purport to own, and have asserted control of the following two properties, according to City of Ypsilanti Building Department Records and an unrecorded 2005 Land Contract (as extended):

    a.  The parcel located at 24-26 N. Huron St., Ypsilanti, Michigan (Washtenaw County Parcel Identification Number ("PIN") 11-11-40-401-011) ("24-26 N. Huron"), which houses Jackson Cleaners.

    b.  The L-shaped parcel behind 24-26 N. Huron (PIN 11-11-40-401-005) (the "L-shaped Parcel").

14. Defendant Vasiliki Pappas is the current owner of, purports to own, and has asserted control of the parcel located at 28-30 N. Huron St., Ypsilanti, Michigan (PIN 11-11-40-401-012) ("28-30 N. Huron"). Vasiliki Pappas acquired 28-30 N. Huron by warranty deed in 2008. Vasiliki Pappas remains the owner of record for 28-30 N. Huron, according to City of Ypsilanti records.

15. The 24-26 N. Huron parcel, the L-shaped parcel, and the 28-30 N. Huron parcel are all situated at the Jackson Cleaners Site and they are collectively referred to herein as the "Defendants' Properties" or the "Properties."

## STATUTORY BACKGROUND

16. Whenever there is a release or substantial threat of release of a hazardous substance into the environment, EPA "is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . or take any other response measure consistent with the national contingency plan" that EPA deems necessary to protect the public health or welfare or the environment. 42 U.S.C. § 9604(a)(1).

### EPA's Access Authorities

17. CERCLA Section 104(e), 42 U.S.C. § 9604(e), grants officers, employees, or duly designated representatives of EPA authority for information gathering and access. Where there is a reasonable basis to believe there may be a

release or threat of release of a hazardous substance or pollutant or contaminant,

CERCLA authorizes EPA "to enter at reasonable times" any vessel, facility,

establishment, or other place or property that falls into one or more of the

following categories: (A) "where any hazardous substance or pollutant or

contaminant may be or has been generated, stored, treated, disposed or transported

from;" (B) "from which or to which a hazardous substance or pollutant or

contaminant has been or may have been released;" (C) "where such release is or

may be threatened;" and (D) "where entry is needed to determine the need for a

response or the appropriate response or to effectuate a response action under this

subchapter." 42 U.S.C. §§ 9604(e)(1), 9604(e)(3).

18.     EPA may exercise this authority to enter "for the purposes of

determining the need for response, or choosing or taking any response action under

this subchapter, or otherwise enforcing the provisions of this subchapter."

42 U.S.C. § 9604(e)(1).

19.     CERCLA Section 104(e) authorizes the United States to commence a

civil action to either compel compliance with a request for access or to compel

compliance with an administrative order for access. 42 U.S.C. § 9604(e)(5)(B).

The statute provides that, where there is a reasonable basis to believe there may be

a release or threat of a release of a hazardous substance, pollutant, or contaminant,

the court "shall enjoin" interference with an EPA request or order for entry "unless

7

under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 9604(e)(5)(B)(i).

20.     Any person who unreasonably fails to comply with an EPA request for access made under 42 U.S.C. § 9604(e)(3) or an order issued under 42 U.S.C. § 9604(e)(5)(A) may be subject to civil penalties of up to $62,689 per violation per day. 42 U.S.C. § 9604(e)(5)(B); 40 C.F.R. § 19.4.

21.     CERCLA, 42 U.S.C. § 9604(e)(6), provides that nothing in CERCLA Section 104(e) shall preclude EPA from securing access in any other lawful manner.

## **GENERAL ALLEGATIONS**

**Site Background and the Jackson Cleaners Building**

22.     The Jackson Cleaners Site is an area in Ypsilanti, Michigan impacted by releases of contaminants classified as hazardous substances under CERCLA. These hazardous substances include PCE and associated chemical compounds created by the breakdown of PCE molecules (i.e., "breakdown products"), including trichloroethylene, cis-1,2-dichloroethytlene, trans-1,2-dichloroethylene, and vinyl chloride. PCE and its breakdown products have contaminated groundwater, soil, and soil gas, as well as the sub-slab air, indoor air, and ambient

air in and around buildings at the Site. Soil gas contamination has created a plume approximately 40,000 square feet in size.

23.     PCE and its breakdown products are volatile and evaporate easily into the air from their liquid states. When volatile compounds such as PCE contaminate soil, they can evaporate and migrate upwards into and through overlying buildings through gaps, cracks, pipes, vents, and other spaces, contaminating indoor air and ambient air in and around buildings. This phenomenon is called vapor intrusion. PCE can also evaporate directly into indoor air from open containers and used equipment stored indoors, where PCE vapors can accumulate or be released into the environment.

24.     Long-term exposure to low-level concentrations of PCE – for example, via the inhalation of PCE vapors – can have adverse neurological effects, including loss of color vision and impaired cognitive and motor function, such as changes in mood, memory, attention, and reaction time. Exposure to PCE could also lead to higher risk of cancer, birth defects, and liver and kidney damage.

25.     The Jackson Cleaners Site includes the eponymous Jackson Cleaners, a dry-cleaning business located at 24-26 North Huron Street, in a row building in Ypsilanti's Historic District, a mixed-use commercial and residential neighborhood along the Huron River.

26.     PCE has previously been stored and used as a dry cleaning solvent at Jackson Cleaners.

27.     24-26 N. Huron, like 28-30 N. Huron and the row building adjoining it on the other side, is mixed-use residential/commercial property which consists of a basement, a commercial unit on the first floor, and residential units on the second floor.

28.     Defendants have owned and operated the Jackson Cleaners business on the first floor of 24-26 N. Huron.

29.     Defendants also own the apartments on the floor above Jackson Cleaners and have in the past leased the apartments to residential tenants.

30.     A tattoo shop operates on the first floor of 28-30 N. Huron, and Defendants have in the past leased the apartments on the second floor of 28-30 N. Huron to residential tenants.

31.     Elevated levels of PCE vapors have been persistently detected in the indoor air of Jackson Cleaners.

32.     Elevated levels of PCE vapors have also been detected in the apartments above Jackson Cleaners.

33.     Elevated levels of PCE have also been found in the indoor air of neighboring and nearby row buildings (including those owned by Defendants).

34.     Since October 2020, the residential units above Jackson Cleaners at 24-26 N. Huron have been condemned as unfit for human occupancy by the City of Ypsilanti after the Michigan Department of Health and Human Services concluded that they posed a public health hazard to residential occupants due to elevated levels of PCE.

35.     In addition to accumulating inside the buildings at the Defendants' Property, PCE vapors are released to the ambient air outside the buildings through ventilation systems and open and poorly weatherproofed doors and windows.

**EPA's Enforcement History at Jackson Cleaners**

36.     In 2019 and 2020, EGLE conducted testing at Jackson Cleaners and other nearby buildings, including those owned by Defendants.

37.     EPA issued an initial Action Memorandum outlining the need for CERCLA response action at the Site on September 3, 2020 ("2020 Action Memorandum"). In this Action Memorandum EPA determined that releases of hazardous substances, pollutants, or contaminants were occurring at the Site due to the presence of PCE in groundwater, soil gas, sub-slab air, and indoor air at levels exceeding Site Action Levels. EPA determined that Site conditions, if not addressed, presented an imminent and substantial endangerment to public health, welfare, or the environment. In that Action Memorandum, EPA selected actions to address actual or threatened releases of hazardous substances at the Site. Those

11

actions included Site assessment and vapor intrusion sampling, as well as the installation of vapor abatement mitigation systems to address vapor intrusion.

38.     EPA sent Defendants a General Notice of Potential Liability dated August 18, 2020, notifying Defendants of their potential liability at the Site, encouraging them to fund or perform required response actions under an order, and stating that EPA was willing to discuss an administrative consent order where EPA would perform or finance the response activities, and then Defendants would reimburse EPA for its costs. It also stated that if a consent order could not be promptly concluded, then EPA may issue a unilateral order under CERCLA, 42 U.S.C. § 9606.

39.     EPA included with the General Notice of Potential Liability a request for access, which Defendants did not agree to at that time.

40.     On November 13, 2020, EPA issued a Unilateral Administrative Order (the "2020 EPA Order") to Defendants, transmitting it to them by mail and email. The 2020 EPA Order required Defendants to conduct the activities outlined in the 2020 Action Memorandum, including sampling and installation of vapor abatement mitigation systems, with EPA oversight. The 2020 EPA Order also required Defendants to submit a notice of intent to comply with the order and submit certain work plans. The 2020 EPA Order became effective on December 17, 2020.

41.     Defendants never submitted a notice of intent to comply with the 2020 EPA Order or any other required submittals.

42.     Furthermore, in December 2020, Defendants informed EPA of their intent to install vapor mitigation systems at Jackson Cleaners and other nearby Defendant-owned properties, without EPA oversight.

43.     Later that month, Defendants informed EPA that they had begun installation of vapor mitigation systems, again without EPA oversight.

44.     By January 2021, Defendants had begun conducting their own sampling and testing at their properties, again without the EPA oversight required by the 2020 EPA Order.

45.     On July 2, 2021, nearly seven months after the 2020 EPA Order became effective, Defendants granted EPA access to the Jackson Cleaners building and the other portions of Defendants' Property by executing a Consent for Access to Property. A copy of that Consent for Access to Property is attached as Exhibit 1 to this Complaint.

46.     The Defendants' Consent for Access to Property granted EPA a right to enter and have "continued access to this property at reasonable times" for various purposes, including for: (i) "[c]ontaining, preparing for, and disposing of hazardous materials present on the property;" (ii) "[c]onducting monitoring and sampling activity;" (iii) "[p]erforming other actions to investigate and mitigate

13

contamination on the property that U.S. EPA may determine to be necessary;" and
(iv) "[t]aking any other response action to address any release or threatened release
of a hazardous substance, pollutant or contaminant which U.S. EPA determines
may pose an imminent and substantial endangerment to the public health or the
environment."

47.     The Consent for Access to Property stated that it would "remain in
effect until July 1, 2023."

**EPA Assessment of Defendants' Property**

48.     On July 12, 2021, EPA inspected the building at 24-26 N. Huron.
EPA identified the Dry Cleaning Machine, which had been used in the course of
Defendants' dry cleaning business at Jackson Cleaners. Defendants reported that
they were no longer conducting dry cleaning within the building. EPA observed
that the Dry Cleaning Machine was wrapped in plastic.

49.     Between July and November 2021, EPA conducted sampling at 24-26
N. Huron and consistently detected the highest levels of PCE on the first floor of
the building, within Jackson Cleaners. First-floor levels exceeded the EPA
management levels for residential and commercial uses, EGLE residential and non-
residential soil vapor intrusion screening levels, EGLE residential and
nonresidential groundwater vapor screening levels, and EGLE time-sensitive
screening levels. Levels of PCE also exceeded EPA management levels and EGLE

14

screening levels and time-sensitive screening levels in the basement and on the second floor.

50.     In July 2021, as a temporary indoor air mitigation measure, EPA deployed three portable air purification units within 24-26 N. Huron to supplement three already-deployed EGLE units. Subsequent EPA sampling from July to November 2021 showed that PCE levels periodically exceeded EGLE screening levels for PCE for residential uses in the building basement even with the air purification units running.

51.     To assess the impact of vapor intrusion on levels of PCE in indoor air, in August 2021, EPA evaluated the functionality of vapor abatement systems that Defendants had unilaterally installed at 24-26 N. Huron and 28-30 N. Huron the previous winter. EPA found one system to be working effectively to control vapor intrusion coming from beneath the 24-26 N. Huron building. EPA found that another system installed at 28-30 N. Huron St. was not adequately designed to intercept sub-surface vapors from the western portion of the basement, potentially allowing vapors from the known sub-surface contamination plume to enter the indoor air within 28-30 N. Huron Street.

52.     Based on the lower levels of PCE in the basement of 28-30 N. Huron relative to Jackson Cleaners, and an evaluation of air flow between the two spaces, EPA determined that the vapor abatement system deficiency at 28-30 N. Huron did

15

not explain the very high levels of PCE within Jackson Cleaners. EPA thus determined that vapor intrusion was not the primary driver of elevated PCE levels at Jackson Cleaners.

53.   To assess the contribution of the Dry Cleaning Machine to PCE levels at 24-26 N. Huron, EPA hired a dry cleaning repair consultant to inspect, decommission, and clean the Dry Cleaning Machine. In late September and October 2021, EPA's consultant completed the decommissioning, resulting in the removal of approximately 55 gallons of liquid PCE and solid waste such as used filters, pads, and carbon from the Dry Cleaning Machine.

54.   In October 2021, after decommissioning the Dry Cleaning Machine, EPA conducted real-time air quality screening of ten different locations across all three levels of 24-26 N. Huron to assess the relative concentration of PCE vapors. PCE levels near the Dry Cleaning Machine were significantly higher than anywhere else in the building throughout monitoring. Furthermore, the levels detected beneath the plastic wrap enclosing the Dry Cleaning Machine were high enough to have saturated the chromatograph, risking damage to the screening tool.

55.   EPA also collected overnight and 24-hour samples of indoor air in October 2021. After detecting high concentrations of PCE in all levels of the building overnight from October 4 to 5, EPA ventilated the building with fans and open windows and doors throughout the day on October 5, stopped ventilation in

16

the evening of October 5, and observed PCE and TCE concentrations with continuous monitoring to mid-morning of October 6. During the ventilation process, PCE concentrations dropped substantially at all locations. Upon discontinuation of ventilation, however, PCE concentrations steadily increased at all locations to approximately pre-ventilation levels over roughly 15 hours throughout the building.

56.     Concurrent with continuous sampling, EPA collected 24-hour indoor air samples from all levels of 24-26 N. Huron from October 5 to 6, and a grab sample of the air within the Dry Cleaning Machine plastic covering. PCE levels in the sample collected from within the Dry Cleaning Machine plastic covering were the highest ever detected in indoor air at the Site at that time.

57.     EPA subsequently collected additional samples of air from within the Dry Cleaning Machine plastic covering in December 2021, February 2022 and March 2022. February and March sampling results indicated that PCE levels rose to approximately three times higher than they were in October 2021 within the air surrounding the Dry Cleaning Machine.

58.     EPA has concluded that the Dry Cleaning Machine is continuing to release PCE vapors at high levels even after having been decommissioned, maintained, and cleaned.

17

59.     EPA has concluded that to address a release or threatened release of hazardous substances at the Site, the Dry Cleaning Machine will need to be removed from the Site.

**Defendants' Initial Attempts to Avoid Removal of the Dry Cleaning Machine**

60.     In early October 2021, EPA informed Defendants of its conclusion that the Dry Cleaning Machine was a major source of PCE emissions, and that the Dry Cleaning Machine needed to be removed from the Site.

61.     On or around October 7, 2021, Defendants informed EPA that, rather than remove the Dry Cleaning Machine they preferred to hire their own expert to evaluate the Dry Cleaning Machine to determine if it could be repaired to eliminate emissions of PCE.

62.     On October 8, 2021, EPA confirmed its understanding – based on conversations with Defendants – that Defendants would identify an expert within one to two weeks who would evaluate the Dry Cleaning Machine. EPA asked the Defendants to inform EPA once Defendants had identified such an expert. EPA also reminded Defendants that they could not proceed with an inspection without EPA supervision, because that would necessarily involve removing the plastic wrap containing PCE vapors emitted from the Dry Cleaning Machine. EPA reminded Defendants not to proceed with any work without coordinating a schedule with EPA.

63.     Two weeks later, on October 21, 2021, EPA sent Defendants an email indicating that EPA had not yet heard from Defendants regarding an expert to inspect the Dry Cleaning Machine. EPA reminded Defendants that they could not proceed with an inspection without EPA supervision.

64.     On October 23, 2021, Defendants responded by email, stating that they believed that EPA's contractor's decommissioning of the Dry Cleaning Machine was done incorrectly, and stating that they would call EPA back with further details.

65.     One week later, on November 2, 2021, EPA sent to Defendants an email indicating that EPA had not received any phone call from Defendants, requesting information on any expert Defendants had hired to inspect the Dry Cleaning Machine, stating that EPA's testing showed the Dry Cleaning Machine to be a source of PCE long before the decommissioning process, and reminding Defendants that they could not proceed with an inspection without EPA supervision. EPA reminded Defendants not to proceed with any work without coordinating a schedule with EPA.

66.     On November 3, 2021, Defendants attempted to contact EPA by phone from an anonymous number in the early hours of the morning, before 8 AM Eastern Time. Because EPA was unable to return the anonymous calls, EPA emailed Defendants to set up a meeting later that week.

67.     On November 3, 2021, Defendants replied by email stating that they had been unable to secure an expert to inspect the machine, and suggested that EPA send EPA's contractor that had decommissioned the Dry Cleaning Machine to re-inspect the machine.

68.     On November 3, 2021, EPA spoke with the contractor responsible for decommissioning the Dry Cleaning Machine, who stated that there was nothing further that could be done to the machine to prevent its release of PCE vapors.

69.     On November 5, 2021, EPA sent Defendants an email stating that EPA's contractor did not think there was anything further to be done to the machine to prevent its releases of PCE. EPA provided Defendants with an additional week to locate an expert to inspect the machine, but maintained that EPA had concluded that the Dry Cleaning Machine would need to be removed from Jackson Cleaners, and reiterated that Defendants could not proceed with any inspection without EPA supervision. EPA reminded Defendants not to proceed with any work without coordinating a schedule with EPA.

70.     From November 12 to November 15, 2021, EPA and Defendants communicated further by email about EPA's contractor. EPA maintained that EPA's contractor thought nothing further could be done to the Dry Cleaning Machine to mitigate PCE emissions. EPA reminded Defendants not to proceed with any work without coordinating with EPA.

71.     On November 17, 2021, Defendants emailed EPA to state that they had identified a prospective technician to inspect the Dry Cleaning Machine sometime the next week. Defendants did not identify the technician, did not specify an inspection date or time, and said they would contact EPA once they had confirmed the time of the inspection.

72.     On November 23, 2021, at 6:09 PM Eastern Time, Defendants emailed EPA that they had scheduled a technician to inspect the machine during the morning of the next day, November 24, 2021, at 10:30 AM.

73.     Because of the short timing of Defendants' notice, EPA would have been unable to coordinate supervision of the inspection or ensure that the removal of the plastic wrap from the Dry Cleaning Machine would not threaten health or safety.

74.     That same day, EPA contacted Defendants by phone and email to reschedule the inspection. That afternoon Defendants emailed EPA to confirm that the technician had been sent back without inspecting the machine.

75.     On December 3, 2021, EPA sent Defendants an email requesting that, by December 9, 2021, Defendants provide to EPA the name of the technician so that EPA could schedule an alternative date for the inspection of the Dry Cleaning Machine. EPA reiterated that Defendants could not proceed with any inspection

without EPA supervision. EPA reminded Defendants not to proceed with any work without coordinating a schedule with EPA.

76.    Defendants never provided EPA the name of the technician that it had hired to inspect the Dry Cleaning Machine, and never provided EPA with alternative dates for the inspection.

**EPA's Order to Remove the Dry Cleaning Machine**

77.    On February 22, 2022, EPA issued an Amended Action Memorandum (the "2022 Action Memorandum"), discussing EPA's findings from its Site assessment activities since issuing the 2020 Action Memorandum. Based on those findings, the 2022 Action Memorandum highlighted the need to remove the Dry Cleaning Machine from the Defendants' Property.

78.    On April 19, 2022, EPA issued the 2022 EPA Order, which required the Defendants to perform certain removal actions that EPA selected for the Site.

79.    Among other things, the 2022 EPA Order required the Defendant to eliminate the emission of PCE and breakdown product vapors from the Dry Cleaning Machine within Jackson Cleaners, including at least by removing the machine from the Site in accordance with EPA's prescribed procedures for planning and implementing off-site response actions, codified at 40 C.F.R. § 300.440.  A copy of the 2022 EPA Order is attached as Exhibit 2 to this Complaint.

80. Section XVIII of the 2022 EPA Order made clear that EPA reserved the right to take over the work and "unilaterally carry out the actions required by this Order, pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604," if Defendants violated or failed or refused to comply with any provision of the Order.

81. Section XIII of the 2022 EPA Order required the Defendants to afford EPA access to their Property: (i) for EPA to oversee all response work by the Defendants under the Order; or (ii) for EPA to perform that response work if the Defendants failed to complete it.

82. The 2022 EPA Order also required Defendants to submit to EPA several documents, including a written notification of intent to comply with the Order, a written notification of personnel to be used in conducting the work under the Order, a written designation of a project manager for the work to be performed under the Order, and more.

**Defendants' Noncompliance with the 2002 EPA Order and EPA's Work Takeover**

83. On May 17, 2022, EPA sent to Defendants a letter stating that Defendants had missed the deadlines for providing to EPA a written notification of intent to comply with the 2022 EPA Order and a written notification of personnel to be used in conducting the work under the Order, and warning that Defendants were at risk of missing several other required deadlines under the Order. EPA included in its letter a table of relevant deadlines.

23

84.     Other than a deficient Health and Safety Plan, EPA never received the required submittals under the 2022 EPA Order.

85.     On June 29, 2022, EPA sent to Defendants a Notification of Work Takeover under Section XVIII of the 2022 EPA Order.

86.     EPA's Notification of Work Takeover reminded the Defendants that the 2022 EPA Order requires, among other things, that Defendants continue to allow access to their Property by EPA, the State, and their representatives, contractors, and subcontractors at all reasonable times to conduct any activity regarding the 2022 EPA Order, the 2020 Action Memorandum, and/or the 2022 Action Memorandum. EPA also reminded the Defendants that the 2022 EPA Order requires them to refrain from using their Property in any manner that EPA determines will pose an unacceptable risk to human health or the environment due to exposure to hazardous substances, pollutants or contaminants, or interfere with or adversely affect the implementation, integrity, or protectiveness of the removal action. EPA also pointed out to Defendants that the 2022 EPA Order specifically prohibits them from interfering with activities conducted by EPA.

**Defendants' Refusal to Allow Access for EPA's Planned Removal of the Dry Cleaning Machine**

87.     On July 22, 2022, EPA sent Defendants a Work Plan for EPA's planned removal of the Dry Cleaning Machine. By email, EPA informed Defendants that EPA would need access to Defendants' Property from July 27 to

24

July 29, 2022, to perform the work, with removal of the Dry Cleaning Machine to occur all day on July 28.

88.     Notwithstanding Defendants' obligation to afford EPA access to their Property under the Consent for Access to Property that they signed, the 2022 EPA Order that they received, and the requirements of CERCLA Section 104(e), the Defendants imposed new and unacceptable conditions that upended EPA's plan to access the Defendants' Property and remove the Dry Cleaning Machine.

89.     On July 27, 2022, Defendants contacted an EPA representative by phone and stated that they would only allow EPA access to remove the Dry Cleaning Machine if EPA would agree to release Defendants from liability and perform no further work at Defendants' Property. The EPA representative stated that EPA could not agree to those conditions, and Defendants stated they would call EPA back.

90.     Defendants never confirmed that they would allow EPA access to remove the Dry Cleaning Machine on July 27, 2022. As a result, EPA was forced to cancel its plans to remove the Dry Cleaning Machine on July 28, 2022 including canceling arrangements with EPA contractors.

91.     On August 4, 2022, EPA provided Defendants a letter reiterating the requirement that they afford EPA access to their Property, emphasizing that EPA would not accept the new conditions that Defendants sought to impose, and

25

requesting that Defendants provide EPA keys to Jackson Cleaners by no later than August 11, 2022.

92.    As of the time of this filing, Defendants still have not complied with EPA's requests for access to Defendants' Property to remove the Dry Cleaning Machine.

## Bases for Relief Under CERCLA Section 104(e)

93.    Each of the parcels constituting Defendants' Property is a facility, establishment, or other place or property: (i) from which or to which a hazardous substance or pollutant or contaminant has been or may have been released; (ii) where a further release of a hazardous substance is or may be threatened; and/or (iii) where entry is needed to determine the need for response or the appropriate response or to effectuate a response action. 42 U.S.C. § 9604(e)(3)(B)-(D).

94.    In addition, 24-26 N. Huron and the L-Shaped Parcel each constitutes a facility, establishment, or other place or property where a hazardous substance may be or has been generated, stored, treated, disposed of, or transported from. 42 U.S.C. § 9604(e)(3)(A).

95.    EPA has determined that there may be a release or threat of a release of one or more hazardous substances, pollutants, or contaminants at each of the parcels constituting the Property. 42 U.S.C. § 9604(e)(1).

26

96.     Therefore, CERCLA grants EPA authority to have access to each of the parcels on the Property "for the purposes of determining the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter." *Id.*

97.     CERCLA also grants EPA authority to have access to each of the parcels on Defendants' Property to inspect and obtain samples from the Property. 42 U.S.C. § 9604(e)(4).

98.     Once EPA gains access to the Defendants' Property, CERCLA grants EPA authority to "act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to" the released hazardous substance. 42 U.S.C. § 9604(a)(1). EPA also is authorized to "take any other response measure consistent with the national contingency plan" that EPA deems necessary to protect the public health or environment. *Id.*

## CLAIMS FOR RELIEF

### First Claim for Relief: Order in Aid of Access

99.     Paragraphs 1through 99 are incorporated herein by reference.

100.    EPA seeks an Order in Aid of Access granting EPA access to the Property.

101.    In accordance with CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), the Court should enter an Order in Aid of Access compelling

compliance with EPA's request and order that EPA shall be allowed to enter the Defendants' Property at reasonable times for the purpose of performing any and all CERCLA response activities described in the 2020 Action Memorandum, the 2022 Action Memorandum, and Section XI of the 2022 EPA Order, including but not limited to the removal of the Dry Cleaning Machine.

### Second Claim for Relief: Civil Penalties

102.    Paragraphs 1through 92 are incorporated herein by reference.

103.    EPA seeks the court's assessment of civil penalties against the Defendants for their refusal to afford EPA access to their Property without EPA's acquiescence to unacceptable conditions.

104.    The Defendants are obliged to afford EPA access to their Property for the purpose of removing the Dry Cleaning Machine under the Consent to Access Property that they signed, the 2022 EPA Order that they received, and the requirements of CERCLA Section 104(e).

105.    Since at least July 27, 2022, the Defendants have unreasonably failed to comply with EPA's requests and order for access to their Property for the purpose of removing the Dry Cleaning Machine.

106.    Because Defendants have unreasonably failed to comply with an EPA request and order for access under 42 U.S.C. §§ 9604(e)(3) and 9604(e)(5)(A),

Defendants are subject to civil penalties of up to $62,689 per violation per day under 42 U.S.C. § 9604(e)(5)(B) and 40 C.F.R. § 19.4.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America respectfully requests that this Court:

1.      Issue an Order granting EPA and its employees, representatives, and contractors any and all access to, through, over, and under Defendants' Property for the duration of time necessary for EPA to perform any and all CERCLA response activities described in the 2020 Action Memorandum, the 2022 Action Memorandum, and Section XI of the 2022 EPA Order, including but not limited to the removal of the Dry Cleaning Machine;

2.      Issue an Order against Defendants enjoining any interference with the access provided above;

3.      Assess against each Defendant a civil penalty, and enter judgment against each Defendant and in favor of the United States, in an amount up to $62,689 per violation per day for Defendants' unreasonable failure to comply with an EPA request and order for access made under 42 U.S.C. §§ 9604(e)(3) and 9604(e)(5)(A);

4.      Award the United States its costs of this action; and

5.      Grant such other relief as this Court deems appropriate.

29

Todd Kim
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

s/ Pedro Segura
Pedro Segura
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Phone:  (202) 514-0096
Fax:  (202) 616-6584

Dawn N. Ison
United States Attorney
Eastern District of Michigan

Susan K. DeClercq
Assistant United States Attorney
Chief, Civil Division
Eastern District of Michigan

OF COUNSEL:
Maria Gonzalez
Associate Regional Counsel
U.S. Environmental Protection Agency