UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 22-12042 |
| | Honorable Laurie J. Michelson |
| v. | |
| VASILIKI PAPPAS and MARIA PAPPAS, | |
| Defendants. | |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT [33] AND ASSESSMENT OF CIVIL PENALTIES [34]**

Mother and daughter, Maria and Vasiliki Pappas, own a now-defunct laundromat, called Jackson Cleaners, in Ypsilanti, Michigan. In 2021, the United States Environmental Protection Agency identified a dry-cleaning machine at Jackson Cleaners that was emitting a dangerous chemical to nearby residences and businesses. Eventually, the EPA determined that the machine needed to be removed. For months, the EPA sought access to remove the machine but the Pappases refused. So on August 31, 2022, the United States filed this lawsuit, on behalf of the EPA, requesting a judicial access order and civil penalties against the Pappases under 42 U.S.C. § 9604(e)(5)(B). (ECF No. 1.)

Subsequently, in December 2022, the parties stipulated to an access order which allowed the EPA access to the Jackson Cleaners Superfund Site to continue its work monitoring, containing, and remediating the release of the hazardous

substance. (ECF No. 17.) But the Government's claim for civil penalties remained unresolved. Following some discovery and unsuccessful settlement negotiations, the EPA now moves for partial summary judgment on its claims for civil penalties. (ECF No. 33.) It seeks an award of $497,800. (ECF No. 34.) The motions are fully briefed (ECF Nos. 41, 42, 43) and do not require further argument. *See* E.D. Mich. LR 7.1(f).

For the reasons that follow, the Court will grant the United States' motion for partial summary judgment and motion for assessment of civil penalties. It will assess a civil penalty of $131,000 against Defendants.

## I.

### A.

At the outset, some background on the relevant statute is helpful. Under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the EPA is tasked with removing, remediating, and mitigating releases and threatened releases of hazardous substances or any "pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare." 42 U.S.C. § 9604(a)(1). And "if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant," *id.* § 9604(e)(1), the EPA is authorized to enter any "facility, establishment or other place or property where entry is needed to determine the need for response or to effectuate a response action," *id.* § 9604(e)(3)(D). This entry power may only be exercised at "reasonable times," however, *id.* § 9604(e)(3), and "only for the purposes of determining the need for response, or choosing or taking any response

action . . . , or otherwise enforcing the provisions of this subchapter," *id.* § 9604(e)(1). If the property owner does not consent to a request for access, the EPA may issue a unilateral administrative order (UAO) directing compliance with the request. *See id.* § 9604(e)(5)(B). And if the property owner refuses to comply with the UAO or request for access, the EPA may seek a judicial order compelling compliance. *See* 42 U.S.C. § 9604(e)(5)(B)(i). A court "may assess a civil penalty not to exceed $67,544 for each day of noncompliance against any person who unreasonably fails" to allow access to property or comply with an administrative order directing access. 42 U.S.C. § 9604(e)(5)(B).

## B.

Now to the particular facts of this case. Maria and Vasiliki Pappas own a defunct laundromat, called Jackson Cleaners, in Ypsilanti, MI. (ECF No. 5-1, PageID.82–83.) The EPA and its Michigan counterpart, the Department of Environment, Great Lakes, and Energy (EGLE), determined that a six-acre plot of land surrounding Defendants' laundromat was contaminated with tetrachloroethylene (PCE), a likely human carcinogen. (*Id.*) PCE is commonly used as a dry-cleaning solvent, and can contaminate soil, soil gas, sub-slab air, indoor air, and groundwater. (*Id.*) In addition to the laundromat, Defendants own surrounding residential and commercial properties, including apartment units directly above the laundromat. (*Id.*) Defendants previously leased the apartments to residential tenants. (*Id.*)

Beginning in 2019, the EPA and EGLE became concerned that Jackson Cleaners, given its former use of PCE solvents, could be causing PCE contamination to surrounding businesses and residences. So the EPA and EGLE collected data on the contamination in 2019 and 2020. (*Id.*) In 2020, the Michigan Department of Health and Human Services determined that the contamination posed a public health risk to residents living above the laundromat. (ECF No. 5-2, Page ID.533.) And in October 2020, the City of Ypsilanti condemned the apartments as "unfit for human occupancy." (*Id.*)

In March 2020, EGLE requested that the EPA take over the lead role at the site. (ECF No. 5-1, PageID.88.) But despite repeated requests for access, the EPA encountered difficulties when trying to collect samples from properties owned by Defendants. (*Id.*) Throughout the fall and winter of 2020, the EPA unsuccessfully attempted to mitigate levels of PCE in neighboring buildings. (*Id.* at PageID.90–91.) The data indicated that PCE vapors continued to migrate through the walls from Defendants' property, where EPA could not investigate. (*Id.*)

In December 2020, the EPA issued a UAO under CERCLA. (*Id.* at PageID.93.) The order mandated Defendants to perform investigatory and mitigation work with the EPA's oversight and required that the EPA be given access to the site, either to oversee that work, or to perform it if Defendants would or could not. (*Id.*)

After receiving consent to access from Defendants, the EPA began collecting data from Defendants' property in July 2021. (*Id.* at PageID.97.) The EPA identified a dry-cleaning machine in Defendants' laundromat as the source of the PCE

4

contamination. (*Id.*) In September 2021, the EPA decommissioned the machine and disposed of the 55 gallons of liquid PCE that were found within the machine. (*Id.* at PageID.99–100.) Even after this cleaning process, however, the machine continued to emit vapors, and PCE levels within the building remained unacceptably high. (*Id.* at PageID.97, 101.)

In October 2021, the EPA informed Defendants that the machine would have to be removed and disposed of, which Defendants resisted. (*Id.* at PageID.101–102.) Defendants hoped to sell the machine and have the buyer assume liability. (*Id.*) They also wanted to hire their own expert to inspect the machine and determine whether it could be satisfactorily repaired. While the EPA agreed to the request, it says no such inspection ever occurred. (*Id.* at PageID.109–110.) Defendants counter that they did attempt to schedule an inspection with an independent expert, but the EPA did not show up. (ECF No. 41, PageID.974.) They state that they gave the EPA three days' advance notice of the scheduled inspection, but on the day it was to occur the EPA representative "was calling and emailed at the last minute that she was not going to be there because she couldn't find anyone to come with her." (*Id.*) Neither party claims that the independent inspection was re-scheduled or ever happened.

In February 2022, the EPA issued an Amended Action Memorandum describing its recent findings and highlighting the need to remove the dry-cleaning machine from Defendants' property. (ECF No. 501, PageID.84–85.) On April 19, 2022, the EPA issued a second CERCLA UAO to Defendants, requiring Defendants to remove the dry-cleaning machine from the site. (*Id.* at PageID.111.) The 2022 UAO

required EPA oversight of the removal and gave the EPA authority to "unilaterally carry out the actions required by this Order" if Defendants did not do so on their own. (*Id.* at PageID.112.) The 2022 UAO also required that Defendants submit a plan to ensure safe performance of the removal. (*Id.*) The EPA met with Defendants and explained these requirements in April 2022. (*Id.* at PageID.113.)

On May 17, 2022, the EPA sent Defendants a warning letter advising that they had missed the deadlines for submissions required by the UAO. (*Id.* at PageID.114.) Defendants state that they were in contact with the EPA around this time and did not miss any deadlines. (ECF No. 41, PageID.974.) Defendants also state that around this time, they had informed their contact at the EPA that they had found a contractor to do the work and were currently on the waiting list with that contractor to perform the removal. (*Id.*)

After another month passed, the EPA orally informed Defendants on June 14, 2022, that it intended to take over the work of removing the machine. (ECF No. 5-3, PageID.641.) Later, on June 29, 2022, the EPA sent Defendants a formal notice stating the same. (*Id.* at PageID.642, 679.) Along with the notification, the EPA informed Defendants that the UAO required them to allow the EPA access to their property at all reasonable times to conduct work related to the UAO, and that the UAO prohibited Defendants from interfering with the activities conducted by the EPA. (*Id.*)

Throughout the following month, the EPA met with Defendants and explained their plan to remove the dry-cleaning machine on July 28, 2022. This included

needing access to the property from July 27 to July 29, 2022. (*Id.* at PageID.644, 687, 689.) During these meetings, Maria Pappas "did not commit, but said she probably would allow the EPA to remove the machine." (*Id.* at PageID.644.) The EPA and Defendants remained in contact over the next few days, discussing details of the removal. (*Id.* at PageID.645–646, 691, 694–703.)

After 10:00 pm on July 26, 2022, the day before the EPA's work was to begin, Maria Pappas emailed the EPA that the next day was "not going to work," and later explained that she had found someone who "could do the work cheaper." (*Id.* at PageID.647–648, 714–716.) Pappas informed the EPA that Defendants would only allow the EPA to remove the dry-cleaning machine if the EPA would agree to release Defendants from liability for the costs of the work and perform no further work at the property. (*Id.*) The EPA did not agree to those conditions, and so Defendants refused to allow the EPA to remove the dry-cleaning machine. (*Id.*)

The EPA was forced to cancel its plans for removal, including arrangements made with the City of Ypsilanti, neighboring property owners, and the EPA contractor. (*Id.* at PageID.648–649.) On August 4, 2022, the EPA sent a letter to the Pappases again requesting access. (*Id.* at PageID.641, 722.) Defendants acknowledged receipt of the letter but still refused to give the EPA access. (*Id.* at PageID.652.)

A few weeks later, on August 31, 2022, the United States filed the present action on behalf of the EPA and sent copies of the complaint to Defendants the same day. (ECF No. 1, PageID.1; ECF No. 6, PageID.732.) Then on September 14, 2022,

the government filed a Motion for Order in Aid of Immediate Access. (ECF No. 5, PageID.42.) The motion requested that the EPA be granted access not only to remove the dry-cleaning machine and dispose of it at an acceptable hazardous waste disposal facility, but also that the EPA be allowed to investigate other potential sources, engage in ongoing monitoring, and perform other activities necessary to bring the PCE pollution down to an acceptable level. (ECF No. 5, PageID.71–72.)

In response, on September 27, 2022, Defendants unilaterally arranged for the removal of the contamination-causing dry-cleaning machine. (ECF No. 6, PageID.733.) They did this without notifying the EPA, without providing any opportunity for EPA oversight, and in violation of the EPA's 2022 UAO. (ECF No. 5-3, PageID.637, 642.) The EPA promptly informed the Court of Defendants' violation of the UAO on October 3, 2022. (ECF No. 6, PageID.743.)

Litigation continued regarding the EPA's Motion for Order in Aid of Immediate Access. At this time, the Pappases were represented by counsel. On December 5, 2022, the parties submitted, and the Court entered, a Stipulated Order in Aid of Immediate Access (*see* ECF No. 17, PageID.800), which granted the EPA access to Defendants' property through March 30, 2024, regardless of Defendants' presence, and required the EPA to give 72 hours' notice before each EPA mobilization (*id*.).

The United States now seeks summary judgment on its claim for civil penalties for the Defendants' refusal to provide the requested access. (ECF No. 33.) The EPA thinks that penalty should be $3,800 per day for each of the 131 days of noncompliance. (ECF No. 34.) According to the government, "the requested penalty

8

period starts when Defendants refused to admit [the] EPA on July 27, 2022 and ends when the Court entered the Stipulated Access Order (ECF No. 17) on December 5, 2022," even though "Defendants' pattern of recalcitrance goes back further." (ECF No. 34, PageID.904.) "In total, the United States requests a penalty of $497,800." (*Id.*) The Pappases, now proceeding pro se, respond that "all necessary work on the premises was completed promptly and in accordance with requirements, with expenses borne by [them]," and they ask the Court to take their "points into careful consideration when making a final decision." (ECF No. 41, PageID.977.)

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." And "[i]n cases where the party moving for summary judgment . . . bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (internal quotation marks omitted).

## III. Discussion

### A. The EPA's Requests Were Reasonable

To request access or take response actions under CERCLA the EPA must demonstrate "a reasonable basis to believe that there may be a release or threat of release of a hazardous substance" at or from Defendants' property. 42 U.S.C. § 604(e).

9

In December 2022, this Court entered a Stipulated Access Order in which the parties stipulated that such a reasonable basis existed. (ECF No. 17, PageID.802.)[1]

Additionally, the undisputed record, including testimony from EPA officials, demonstrates the existence of a reasonable basis for the EPA's belief that there was a release or threat of release of a hazardous substance at Defendants' business. (*See* ECF Nos. 5-1, 5-2, and 5-3.)

The § 604(e)(1) reasonable basis standard is an "undemanding standard" that is "easily satisfied" in most cases. *United States v. Fisher*, 864 F.2d 434, 438 (7th Cir. 1988) (finding the standard satisfied when an EPA manager smelled hazardous substances, saw discarded waste drums, distressed vegetation, and stained soil at a site); *United States v. Tarkowski*, 248 F.3d 596, 599 (7th Cir. 2001) (finding that "even a thimbleful of hazardous substance" or "a single flake of asbestos" would satisfy the standard because § 9604(e)(1) says nothing about magnitude).

This undemanding standard is easily met in this case because the EPA had concrete evidence of an actual release of a hazardous substance. (ECF No. 5, PageID.73.) Early testing "detected levels of PCE and its breakdown products

---

[1] As a result, Defendants are precluded from challenging this issue. In the Sixth Circuit, "[s]tipulations voluntarily entered by the parties are binding." *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1038 (6th Cir. 1991) (finding a stipulation binding where it was clear that the challenging party was an active participant in drafting the stipulation); *Brown v. Tenn. Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980) (observing that stipulations are binding on both parties and the court). And "[s]tipulations waiving an issue or argument that might otherwise be waived will generally be treated as binding and conclusive." *See Michigan Dep't of Transportation v. Grand River Navigation Co., Inc.*, No. 11-1335, 2013 WL 12123886, at *1 (W.D. Mich. Jan. 22, 2013) (quoting *Leuhsler v. Comm'r*, 963 F.2d 907, 911 (6th Cir. 1992).).

throughout the property, both beneath the buildings and in the indoor air," and later testing "detected PCE in outdoor air as well." (*Id*.) In addition, at the residential units above the laundromat, "contamination [had] multiple times in the past exceeded state screening levels." (*Id*.) Indeed, the "EPA sampling . . . consistently detected large amounts of PCE vapors off-gassing from the Dry-Cleaning Machine," contaminating the Jackson Cleaners building, neighboring buildings, and the surrounding environment. (*Id*.)

This contamination persisted even after the EPA removed 55 gallons of PCE from the machine at issue. (ECF No. 5-1, PageID.99–100.) And the EPA is "authorized to enter at a reasonable time" any facility "where entry is needed to . . . effectuate a response action" including "the cleanup or removal of released hazardous substances from the environment" and disposal or storage of hazardous materials. 42 U.S.C. § 9604(e)(3)(D); 42 U.S.C. § 9601 (23–25).

Thus, as a matter of law, the EPA acted reasonably and within its clear statutory authority in requesting to remove the dry-cleaning machine from Defendants' property on July 27, 2022.

### B. Defendants Unreasonably Failed to Comply with EPA Orders for Access

Under 42 U.S.C. § 9604(e)(5)(B)(ii), courts may assign civil liability if a person "unreasonably fails to comply" with orders to grant access to property, provide information, or take a response action. Courts have previously found that "Congress intended to impose a strict liability standard for violations of CERCLA," and that the government need not prove that a defendant "intended to act unreasonably, only that

he did." *United States v. Crown Roll Leaf, Inc.*, 1988 U.S. Dist. LEXIS 15785 (D.N.J. 1988); *United States v. Barkman*, 784 F. Supp. 1181, 1187 (E.D. Pa. 1992). Accordingly, a defendant's state of mind is irrelevant to a reasonableness determination. *United States v. Ponderosa Fibres of Am.*, 178 F. Supp. 2d 157, 162 (N.D.N.Y. 2001).

In light of this standard, courts have refused to excuse defendants from liability absent "severe, atypical logistical problems impeding a proper response." *United States v. Gurley*, 235 F. Supp. 2d 797, 804 (W.D. Tenn. 2002). In *Gurley,* for example, the defendant was issued an information request under CERCLA which he evaded for over a year. *Id.* at 800. The EPA sent letters via certified mail and Federal Express to Gurley's home, his office, and his attorney's office; they sent an EPA representative in person to Gurley's office; and finally they sent U.S. Marshals to deliver the letter to Gurley's wife. *Id.* at 800–01. Gurley then provided a "terse," incomplete response to the EPA's request, prompting an additional request for information. *Id.* at 801. Gurley responded with another "incomplete and evasive" response. *Id.* The court found that since Gurley offered no "severe, atypical logistical problems" that would excuse his insufficient response, his evasive behavior constituted an unreasonable failure to comply. *Id.* at 803, 805.

Courts have also found that parties who attempt to impose "unacceptable pre-conditions to access" have unreasonably failed to comply with an EPA request for

access to property.[2] *See Cannistra Realty, LLC v. United States EPA*, 2021 WL 6113386, at \*11 (S.D.N.Y. 2021). In *Cannistra*, the defendant owned a building and parking lot leased by Tesla to operate a dealership. The EPA sought access to the property to ensure that radiation from a neighboring property had not contaminated the dealership. *Id.* at \*3. In response to the EPA's request, Cannistra expressed concern over whether the testing would affect business operations or lead Tesla to break their lease. *Id.* Cannistra attempted to impose conditions to access, including that the EPA do its work on a national holiday or before and after business hours, and that the EPA agree to indemnify Cannistra for loss of revenue. The court held that these "pre-conditions" were a denial of access and amounted to a CERCLA violation. *Id.* at \*32.

Similarly here, Defendants' conduct between July 26, 2022, and December 5, 2022, constitutes an unreasonable failure to comply with the EPA's administrative order under 42 U.S.C. § 9604(e)(5)(B)(ii). Defendants appeared to agree to the EPA's planned removal of the dry-cleaning machine between July 27 and July 29, only to revoke consent at the last minute—the evening before the removal. (ECF No. 5-3, PageID.647, 714–716.) They did so despite the EPA's notifications that the UAO

---

[2] EPA Directive No. 9829.2 (June 5, 1987) supports the *Cannistra* court's finding. It instructs that conditions of access are construed as a denial of consent under CERCLA when they "restrict or impede the manner or extent of an inspection or response action [or] impose indemnity or compensatory obligations on EPA." In keeping with recent Supreme Court decisions, this Court yields to this EPA directive only to the extent that its reasoning is persuasive. *Loper Bright Enters. v. Raimondo* 603 U.S. ___ (2024) *Relentless, Inc. v. DOC,* 603 U.S. ___ (2024) (citing *Skidmore v. Swift & Co.*, 323 U. S. 134, 140 (1944)).

required Defendants to allow the EPA access to their property at all reasonable times to conduct work related to the removal of the dry-cleaning machine, and that the UAO prohibited Defendants from interfering with the activities conducted by the EPA. (*Id.*) Defendants have offered no "severe, atypical logistical" problems to justify their non-compliance. *Gurley*, 235 F. Supp. 2d at 805. Stated differently, refusing the EPA access to remove the machine at the last minute to try to secure a cheaper means of removal is not a "severe, atypical logistical" justification that would make Defendants' conduct reasonable.

Further, when the EPA tried again, Defendants attempted to impose "unacceptable pre-conditions to access." *Cannistra*, 2021 WL 6113386, at *11. At that time, Defendants demanded that the EPA release them from liability for the costs of the removal and agree to perform no further work at the property. When the EPA did not agree to those conditions, Defendants refused to allow the EPA to remove the dry-cleaning machine or give the EPA further access the property. (ECF No. 5-3, PageID.647.) These pre-conditions on the EPA's access also constitute an unreasonable failure to comply with the EPA's UAO. *See Cannistra*, 2021 WL 6113386, at *11.

Finally, beyond merely denying the EPA access to perform the ordered removal, Defendants unilaterally arranged for the removal of the contaminated dry-cleaning machine. This was in clear violation of the 2022 administrative order, which provided that Defendants were required to submit a plan for pre-approval by a specific time period, and that the EPA had to be present for any such removal. (ECF

14

No. 6, PageID.733; ECF No. 5-3, PageID.637.) But the EPA was not notified and it had no opportunity to ensure that the removal was performed in a way that would protect human health and the environment from further releases. (ECF No. 6, PageID.734.)

In sum, Defendants' initial denial of access, their attempt to impose pre-conditions to access, and their unsupervised removal of the contaminated dry-cleaning machine in defiance of the 2022 UAO clearly support a finding of unreasonable non-compliance under § 9604(e)(5)(B)(ii).

Defendants offer several explanations of their behavior in their response brief, none of which meaningfully refute the Court's finding that Defendants unreasonably denied the EPA access to their property. (*See* ECF No. 41.)

Start with Defendants' allegation that the EPA's actions were motivated by racial animus against Defendants because they are Greek. (*Id.* at PageID.973.) Defendants state that during an initial interaction, EPA coordinator Betsy Nightingale stated, "you are Greek, you don't understand." (*Id.*) Defendants further claim that "[t]his is all a personal issue that Ms. Betsy Nightingale had with us. She only knew how to speak down to us as if we were ignorant and discriminated against our national origin of being Greek." (*Id.* at 975.)

It is true that EPA response actions are not authorized by CERCLA if they are "arbitrary and capricious" or "an abuse of discretion." 42 U.S.C. § 9604(e)(5)(B)(i). Accordingly, if the EPA's access orders and response action were motivated by racial animus, rather than a reasonable belief that there was a release or threat of release

of a hazardous substance, then they would not be authorized by the statute. Defendants' allegations, however, do nothing to rebut the undisputed and extensive test results indicating the actual release of hazardous substances from Jackson Cleaners. (ECF Nos. 5-1, 5-2, and 5-3.) Nor do Defendants provide any admissible evidence to support their cursory allegations of racial animus. It is by no means clear that Nightingale is at a level within the EPA where her statements would be non-hearsay admissions. Nor do Defendants provide any sworn declarations of their own. *See McMurry v. Morton S. Scholnick & Ass'n Mgmt.*, 932 F.2d 968 (6th Cir. 1991) (finding that the district court did not err in granting motion for summary judgment where response brief was filed without any supporting affidavits or other evidence and noting that "a party may not simply rest on her pleadings in response to a motion for summary judgment." (citing Fed. R. Civ. P. 56(e)).

What is more, even if the Court were to consider this singular statement from an EPA official, it does not create a genuine issue of material fact that precludes summary judgment. For one, Defendants do not state when this alleged statement was made, nor do they provide any evidence that Nightingale or her alleged racial animus, influenced the EPA's decision to seek access to the Defendants' property and removal of the contaminated dry-cleaning machine. For two, in the Stipulated Access Order signed in December 2022, the parties agreed that the EPA's response action was authorized by CERCLA. (ECF No. 17, PageID.803.) Even if the allegations of racial animus were true, therefore, Defendants already waived any argument that the EPA lacked a reasonable basis to access the property and take a removal action.

*See* supra n. 1. And recall that CERCLA "does not require the United States to prove 'that a defendant accused of violating § 9604(e)(5)(B) intended to act unreasonably, only that he did.'" *Gurley*, 235 F. Supp. 2d at 803. Thus, any argument by Defendants that their non-compliance was motivated by a belief that they were the target of racial animus, does not mean they did not act unreasonably.

Defendants also question the competence of the EPA workers. They allege that an EPA contractor who was hired to decommission the dry-cleaning machine was incompetent and may have caused the ongoing problem because he did not know how to properly do the work. (ECF No. 41, PageID.973–974.) And they state that the EPA hired a man to do some testing who arrived at the property "under the influence of illicit drugs. He could barely stand up and was vomiting within and outside of the property, which Vasiliki Pappas had to clean up . . . . This basically, put other humans at risk, particularly an elderly woman, Ms. Pappas plus still being under a pandemic." (*Id.* at PageID.973.)

But Defendants provide no citations to anything in the record to support these statements. And even if the Court treated their pro se response like a sworn declaration—which it is not—such misconduct by two contractors would not be material to the determination that Defendants unreasonably failed to comply with the EPA's valid access orders. Defendants' non-expert assessment that the work to clean up the hazardous substances from the machine was done poorly or unprofessionally did not excuse their legal obligation to reasonably comply with the EPA's subsequent UAO mandating removal of the machine, conditions for removal,

and continued access. Both incidents cited by Defendants happened in or around September 2021, well before the July 26, 2022 to December 5, 2022, time period during which the EPA seeks penalties for non-compliance. Indeed, the two contractors about whom Defendants complain had no apparent role in the planned July 2022 removal of the dry-cleaning machine. Thus, Defendants' complaints about the contractors do not create any genuine issues of material fact.

Finally, Defendants counter that they were mostly compliant with EPA instructions to modify the property, but that it was difficult to fully comply with the EPA's instructions because the EPA never had a clear plan in place. (ECF No. ECF No. 41, PageID.973–974.) According to Defendants, "We put ourselves in the worst financial burden, in the installation of mitigation systems, performed work to buildings and did our own tests on properties in 2020 and thereafter . . . ." and that "[EPA Coordinator Tricia Edwards] never had a plan in place, nor did [EPA Coordinator Betsy Nightingale]. We would ask Betsy who is coming, what are they doing?"[*sic*] and she kept it a secret, it was like pulling teeth . . . ." (*Id*.)

The Court does not doubt that Defendants were frustrated with the economic and time burdens placed on them due to the EPA's lengthy investigation and clean-up efforts. But they do not impact the Court's reasonableness determination. Parties subject to a CERCLA investigative request "may not decide for the EPA when they have provided sufficient information." *Gurley*, 235 F. Supp. 2d at 804. Unreasonable failure to comply with information requests and with administrative orders are assessed under the same CERLCA subsection, § 9604(e)(5)(B)(ii). Accordingly,

18

parties may not decide for themselves when they have sufficiently complied with EPA directives—and proceed to simply ignore future directives and requests. The EPA is statutorily charged with investigating, monitoring, and taking or ordering the appropriate remedial action when hazardous substances are involved. Defendants' conduct unreasonably prevented the EPA from carrying out its statutory duties. Defendants' partial compliance and earlier efforts to remedy the situation (as they saw fit) does not alter this conclusion.

In sum, on the record before the Court, Defendants unreasonably failed to comply with the EPA's directives. As such, they are liable for civil penalties under 42 U.S.C. § 9604(e)(5)(B)(ii). That just leaves the question of how much?

## IV.

Under CERCLA, the Court may assess a civil penalty not to exceed $67,544 for each day of noncompliance against any person who unreasonably fails to allow access to property or comply with an administrative order directing access. 42 U.S.C. § 9604(e)(5)(B); 28 U.S.C. § 2461; 40 C.F.R. § 19.4; *see Cannistra Realty*, 2021 WL 6113386, at *11. Importantly, Courts have discretion in determining the amount of a civil penalty under § 9604(e)(5)(B). *Cannistra Realty,* 2021 WL 6113386, at *11. Generally, "[i]n exercising its discretion, a court should give effect to the major purpose of a civil penalty: deterrence." *United States v. M. Genzale Plating, Inc.*, 807 F. Supp. 937, 939 (E.D.N.Y. 1992).

In determining the appropriate penalty amount for CERCLA violations, courts typically consider: "(1) the good or bad faith of the [non-compliant party], (2) the

19

injury to the public, (3) the [non-compliant party's] ability to pay, (4) the desire to eliminate the benefits derived by a violation, and (5) the necessity of vindicating the authority of the enforcing agency." *Genzale,* 807 F. Supp. at 939 (collecting cases); *Gurley*, 235 F. Supp. 2d at 806.

The government argues that based on these factors, the Court should assess a substantial penalty in the amount of "$3,800 per day for 131 days of violation, starting when Defendants refused to admit the EPA on July 27, 2022 and ending when the Court entered the Stipulated Access Order on December 5, 2022." (ECF No. 34, PageID.913.)

Start with the first factor—bad faith. Defendants "deliberately violated the EPA Order by refusing to allow the EPA access" to their property "despite having previously recognized EPA's authority to enter [their] property to [remove the dry cleaning machine]." *Genzale*, 807 F. Supp. at 937. Additionally, Defendants appeared to put "their own financial interests above a potentially serious threat to the environment and the health and safety" of workers, the public, and surrounding businesses/homes. *Cannistra Realty,* 2021 WL 6113386, at *32. When the EPA notified Defendants of its intent to remove the dry-cleaning machine, Defendants prioritized their investment in the equipment (and seeking cheaper removal options) above public health, resisting removal of the machine for months. (ECF No. 5-1, PageID.101–110.) Defendants also denied the EPA access to remove the machine with less than 24-hours' notice despite having previously recognized the EPA's authority to enter their property. (ECF No. 5-3, PageID.647, 714–716.) As the

20

government notes, in denying the EPA's removal efforts, Maria Pappas told the EPA that she found someone who "could do the work cheaper," complained that the EPA did not receive multiple bids, and alleged that the EPA was paying "too much" for the removal. (*Id.* at PageID.647.) A day later, Defendants emailed the EPA raising issues with the EPA's contractor, scheduling, and "most of all COST to me for [the] EPA to be unsure if this would solve the issue in building [sic]." (*Id.* at PageID.720.) Defendants' earlier efforts to comply with EPA orders and take steps to mitigate do not absolve them of their subsequent bad faith conduct. So this factor weighs in favor of the imposition of a penalty.

The second factor, injury to the public, does as well. Defendants' violations prolonged public exposure to hazardous substances, delayed the EPA's response actions, and risked improper disposal of hazardous substances. Courts have found that "[d]elaying [EPA's] investigation and cleanup efforts also constitute injury to the public." *United States v. Timmons Corp.*, No. 103-00951, 2006 WL 314457, at *16 (N.D.N.Y. Feb. 8, 2006). The public is harmed both where there may be exposure or potential exposure to hazardous substances, and where the violation meant that the removal action may have been "inefficient and less economical than normal as the substantial delay caused the EPA to incur extra costs it may not have had to expend." *Id.*; *see also Gurley*, 235 F. Supp. 2d at 807.

Defendants denied the EPA access despite a well-documented risk of public exposure to PCE and its breakdown products. (ECF No. 5-2, PageID.498.) Long-term exposure to PCE can cause birth defects, liver and kidney damage, and neurological

effects such as loss of color vision and impaired cognitive and motor function. (ECF No. 5-1, PageID.118.) Indeed, the EPA classifies PCE as a likely carcinogen and at least one breakdown product as a known carcinogen. (ECF No. 5, PageID.53.) The EPA also documented the hazardous conditions on Defendants' property spreading to nearby properties including residential and commercial spaces. (ECF No. 5-2, PageID.533; ECF No. 5-1, PageID.82–83.) And Defendants' unapproved removal of the dry-cleaning machine risked further injury to the public. (ECF No. 6, PageID.73.) The EPA's 2022 UAO required several environmental, health, and safety guardrails. (ECF No. 5-1, PageID.111.) This included EPA oversight over any removal conducted by Defendants to ensure that disposal of the machine was consistent with the EPA's off-site rule that prevents removal actions from creating new hazardous sites by directing wastes to approved locations. (*Id.*) Defendants have not provided any evidence that refutes or contradicts these facts. So this factor also favors the assessment of a substantial civil penalty.

The government argues that the third factor, ability or inability to pay, weighs in favor of a significant penalty. (ECF No. 34, PageID.923.) In particular, the government notes that Defendants refused to provide complete information about their financial status during discovery, despite repeated requests. (*Id.*) And although Defendants make conclusory assertions about their lack of ability to pay, public records indicate the Defendants own at least seven properties and nine vehicles, with an apparent value exceeding $1,000,000. (ECF No. 34-1, PageID.939.) Nonetheless, the Defendants in *Cannistra* were also able to pay a significant penalty, and the Court

there found this factor was neutral. *See Cannistra Realty,* 2021 WL 6113386, at *11 (explaining that while Cannistra has an ability to pay, this factor "does not significantly weigh one way or the other"). And it is not so clear here that Defendants are able to pay the half-million-dollar penalty being sought by the government. There is no dispute that their dry-cleaning business is defunct. And they are currently proceeding pro se. Their prior counsel withdrew for lack of payment. (ECF No. 24.) So this factor is neutral.

The fourth factor considers the benefit to Defendants from their failure to comply. The government argues Defendants benefited from the delay alone. But in *Cannistra* the court found that this factor did not weigh in favor of a significant penalty where "the only benefit . . . was delay—a delay that enabled it to collect rent for a year before informing its tenant of the EPA's concerns . . . and (it thought) risking the tenant breaking the lease." 2021 WL 6113386, at *12 (noting that the benefit from the delay "was difficult to quantify").

The government also contends that Defendants benefited from their failure to comply by reducing the cost of the removal. The Court agrees. Defendants' refusal to comply allowed them to facilitate a removal of the dry-cleaning machine without the costs of EPA oversight or compliance with any of the environmental, health, and safety guardrails required under the EPA's 2022 UAO, including the costs of transporting the machine to an EPA-approved disposal facility. (ECF No. 5-1, PageID.111, 120–22.) And this benefit seemed to be what motivated Defendants' noncompliance. So the Court finds that this factor supports a penalty.

23

The fifth factor considers the need to vindicate the EPA's authority. It has been described as "[t]he most important [one] . . . supporting the imposition of a significant civil penalty . . . in matters such as this." *Timmons*, 2006 WL 314457 at *17 (cleaned up). "A significant penalty is necessary to underscore the seriousness of the . . . authority of EPA and to ensure it is not ignored . . ." *Id.* As noted in *Cannistra*, the "EPA has far more important work to do, and far more important ways to spend its limited resources, than negotiating, and then litigating, with property owners who impose a myriad of access conditions before allowing the mitigation of potential dangers to the environment and public health." 2021 WL 6113386, at *12. "[T]o allow an unreasonable denial" of access, like Defendants did here, "to go unpunished . . . would encourage others" to refuse to grant EPA access to private property to test for harmful contaminants, which in turn would impede "the agency's ability to remedy problem sites." *Timmons,* 2006 WL 314457 at *17. This factor weighs in favor of a substantial penalty.

"[B]ecause each factor justifies a substantial penalty," says the government, "the Court should assess a penalty commensurate with the $2,000 and $3,000 per day penalties assessed in *Genzale* and *JG-24,* with an upward adjustment to account for inflation from the dates of those decisions (respectively, 1992 and 2004)." (ECF No. 34, PageID.929.) As noted above, however, the Court believes the ability to pay factor does not significantly weigh one way or the other. And there were some periods of time where the Defendants negotiated with the government and provided stipulations that helped to reduce some of the litigation. So while the Court agrees

24

with the government that the majority of the factual background counsels in favor of imposing a significant penalty, that can be accomplished with a daily rate less than $3800.

Indeed, courts have imposed a broad range of penalties for non-compliance, many of which are significantly below the amount the government seeks. *JG-24*, 331 F. Supp. 2d at 72 ($3,000 per day for access violation); *Genzale*, 807 F. Supp. at 940 ($2,000 per day for access violation); *Gurley*, 235 F. Supp. 2d, at 808–09 ($500, $1000, and $2,000 per day); *Cannistra Realty, LLC*, 2021 WL 6113386, at *13 (imposing $750 per day penalty for access violation, and noting that "while a significant penalty is warranted, I believe that the $2,000 to $3,000 per day range is too high"); *see also Timmons*, 2006 WL 314457, at *17 ("[C]ourts [across the country] have proposed penalties of $2,000, $1,000, $500, $75, and $55 per day depending on the situation") (collecting cases).

Importantly, as the government acknowledges, courts have discretion in determining the amount of a civil penalty under 42 U.S.C. § 9604(e)(5)(B). *Cannistra Realty*, 2021 WL 6113386, at *11. The Court believes that in balancing the five factors for assessing a civil penalty under CERCLA, and in comparing and contrasting other similar cases, a substantial penalty of $1000 a day is warranted here. Considering the 131 days of access delay, this amounts to a total aggregate penalty of $131,000.

## V.

For the reasons stated above, the United States' motions for partial summary judgment (ECF No. 33) and assessment of civil penalties (ECF No. 34) are

GRANTED. The Court will assess a penalty in the amount of $131,000 against Defendants. A separate judgment will follow.

SO ORDERED.

Dated: September 17, 2024

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE